UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

-------------------------------------------------------------

Segundo A.P.G.,                      )    File No. 26-cv-603
                                     )           (JWB-LIB)
          Petitioner,                )
                                     )
vs.                                  )    St. Paul, Minnesota
                                     )    February 3, 2026
Pamela Bondi, Kristi Noem,           )    1:05 p.m.
Department of Homeland               )
Security, Todd M. Lyons,             )
Immigration and Customs              )
Enforcement, Daren K.                )
Margolin, Executive Office for       )
Immigration Review, and David        )
Easterwood,                          )
                                     )
          Respondents.               )
-----------------------------    )    ----------------------
                                     )
Roman N.,                            )    File No. 26-cv-282
                                     )           (JWB-DLM)
          Petitioner,                )
                                     )
vs.                                  )
                                     )
Donald J. Trump, Pamela Bondi,       )
Kristi Noem, Todd M. Lyons,          )
and David Easterwood,                )
                                     )
          Respondents.               )
-----------------------------    )    ----------------------
Oscar O.T.,                          )    File No. 26-cv-167
                                     )           (JWB-JFD)
          Petitioner,                )
                                     )
vs.                                  )
                                     )
Pamela Bondi, Kristi Noem,           )
Todd M. Lyons, and David             )
Easterwood,                          )
                                     )
          Respondents.               )
                                     )
                                     )
                                     )
                                     )

ERIN D. DROST, RMR-CRR
(651) 848-1227

Jose L.C.C.,                              )  File No. 26-cv-244
                                          )            (JWB-DTS)
          Petitioner,                     )
                                          )
vs.                                       )
                                          )
Pamela Bondi, Kristi Noem,                )
Department of Homeland                    )
Security, Todd M. Lyons,                  )
Immigration and Customs                   )
Enforcement, Daren K.                     )
Margolin, Executive Office for            )
Immigration Review, and David             )
Easterwood,                               )
                                          )
          Respondents.                    )
-----------------------------             )   -----------------------
Juan V.A.C.,                              )  File No. 26-cv-645
                                          )            (JWB-EMB)
          Petitioner,                     )
                                          )
vs.                                       )
                                          )
Pamela Bondi, Kristi Noem,                )
Todd M. Lyons, and David                  )
Easterwood,                               )
                                          )
          Respondents.                    )
---------------------------------------------------------------

                BEFORE THE HONORABLE JERRY W. BLACKWELL
                 UNITED STATES DISTRICT COURT JUDGE

                         **(SHOW CAUSE HEARING)**

      Proceedings recorded by mechanical stenography;
transcript produced by computer.

APPEARANCES

For the Petitioner Juan    Climate Defense Project
V.A.C. and Oscar O.T.:     KIRA A. KELLEY, ESQ.
                           PO Box 7040
                           Minneapolis, Minnesota 55407

For the Petitioner         Groundwork Legal
Oscar O.T.:                IRINA VAYNERMAN, ESQ.
                           1650 West End Boulevard
                           Suite 100
                           St. Louis Park, Minnesota 55416

For the Respondents:       United States Attorney's Office
                           ANA H. VOSS, ESQ.
                           JULIE T. LE, ESQ.
                           300 South 4th Street
                           Suite 600
                           Minneapolis, Minnesota 55415

Court Reporter:            ERIN D. DROST RMR-CRR
                           Suite 146
                           316 North Robert Street
                           St. Paul, Minnesota 55101

**P R O C E E D I N G S**

**IN OPEN COURT**

THE COURT:  Please be seated.

Would you please call the cases.

THE LAW CLERK:  We are here on five different matters:

Case Number 1, Segundo A.P.G. v. Pamela Bondi, et al.  Case Number 26-cv-603 JWB/LIB.

Case Number 2, Oscar O.T. v. Pamela Bondi, et al. Case Number 26-cv-167 JWB/JFD.

Case Number 3, Jose L.C.C. v. Pamela Bondi, et al. Case Number 26-cv-244 JWB/DTS.

Case Number 4, Roman N. v. Donald Trump, et al. Case Number 26-cv-282 JWB/DLM.

And Case Number 5, Juan V.A.C. v. Pamela Bondi, et al.  Case Number 26-cv-645 JWB/EMB.

THE COURT:  All right.  Could I have the parties first note their appearances starting with the Government.

MS. LE:  Good morning, Your Honor.  Julie Le, and with me Ms. Ana Voss for the Government.

THE COURT:  All right.  Good afternoon.  You may be seated.

And then for any petitioners, if you would state your name and which matter you're here on.

MS. KELLEY:  Good morning, Your Honor.  Kira Kelley here on behalf of Oscar O.T. and Juan V.A.C.

THE COURT:  All right.  Good afternoon.

MS. VAYNERMAN:  Good afternoon.  Irina Vaynerman from Groundwork Legal for Oscar O.T.

THE COURT:  Good afternoon.  You may be seated.

The hearing this afternoon concerns compliance with court orders; not policy, just compliance.  Nothing else.

I've had so many issues with noncompliance in just this past week that I called for this hearing.  Today's focus is just on those that were attached to Ms. Le.  So what I intend to do at this hearing is first to make some general remarks to set the table.

Next, I want to respond to the submissions I received from Ms. Voss and Ms. Le within the last couple of hours.

Then, third, I do want to hear from Ms. Le on each of the five matters, the cases, to help me to understand why the noncompliance and why it takes so many different communications and follow-ups from the Court seeking compliance.

And then, last, I'll have some questions for the Government.

The petitioners will have an opportunity to

comment if they wish, although the focus of this hearing is the Court's understanding -- trying to reach some understanding with respect to the noncompliance.  And what I really want is to fix it going forward.

So the general comments:  As I hope everybody here agrees and acknowledges, that a court order is not advisory and it is not conditional.  It is not something that any agency can treat as optional while it decides how or whether to comply with the court order.  The authority exercised by the Court is derived from Article III of the Constitution and is not by dint of the parties' agreement with the ruling itself.

That authority under Article III only has meaning if the court orders are obeyed, adhered to promptly, fully, and in good faith.  That obligation matters most where liberty is at stake.  Detention without lawful authority is not just a technical defect, it is a constitutional injury that unfairly falls on the heads of those who have done nothing wrong to justify it.  The individuals affected are people.  The overwhelming majority of the hundreds seen by this Court have been found to be lawfully present as of now in the country.  They live in their communities.  Some are separated from their families.

When a release order is not followed, the result is not just delay.  In some instances, it is the continued

detention of a person the Constitution does not permit the Government to hold and who should have been left alone, that is, not arrested in the first place.

You all, that is the respondents, represent the United States. That carries obligations with it. The DOJ, the DHS, and ICE are not above the law. They do wield extraordinary power, and that power has to exist within constitutional limits. When court orders are not followed, it's not just the Court's authority that's at issue. It is the rights of individuals in custody and the integrity of the constitutional system itself.

So with that said, I want to respond to the submissions I received from Ms. Le and from Ms. Voss. And I received them just under two hours ago, but I want to address certain points with respect to those directly.

The Government makes the point that some of the attorneys currently are under extraordinary strain, and you are obviously telling that to this Court understanding that the operation that explains this process is not an operation that is driven by the Federal Courts. I do accept that Operation Metro Surge has generated a volume of arrests and detentions that has taxed existing systems, staffing, and coordination between DOJ and the DHS. I read that in your papers. I understand that.

I also don't have any reason to take issue at this

time that individual attorneys, including those appearing here, are working in good faith and under difficult circumstances. But those facts, even taken as true, do not answer the legal problem that it presents for this Court. If the Government undertakes an enforcement operation of this scale, one that results in the detention of large numbers of people, including individuals who are lawfully present in the United States, then the Government assumes a corresponding obligation to ensure that each detention complies with the Constitution and with court orders governing release. Volume, that is, the volume of cases and matters, is not a justification for diluting constitutional rights and it never can be. It heightens the need for care.

Having what you feel are too many detainees, too many cases, too many deadlines, and not enough infrastructure to keep up with it all, is not a defense to continued detention. If anything, it ought to be a warning sign.

But what you cannot do is to detain first and then sort out lawful authority later. Continued detention is not lawful just because compliance with release orders is administratively difficult or because an operation has expanded beyond the Government's capacity to execute it lawfully.

This Court is not persuaded by the suggestion that

detailed release requirements are the source of the problem. In many instances, I have had to not just issue an order, but another order, another order, another order, about 7 or 8 different touches sent to the Government simply asking for the date, time, and location of the release of someone who was ordered released, in many instances, a week or more in the past.

And why that is so difficult, I cannot understand, because there's obviously a person associated with the Government who is going to the detainee to release him or her. You have their name. You can carry with you a form. The name is on it. Just write the time on it and send it to the DOJ. That cannot be a reason, a source for this problem of the noncompliance because that's too easy to fix, and I don't even work for the Executive Branch.

But the requirements that the Court has in place exist because individuals were being detained without lawful authority, they were being transferred contrary to orders, or released in ways that undermine the relief that was granted by the Court.

The precision that the Court here, not just me, but all the judges, the precision that we are requiring is not meant to be punitive. It's remedial in nature.

So to be clear, this hearing is really not about trying to find ways to punish individual lawyers or

second-guessing good-faith efforts.  It's about institutional compliance.

So, Ms. Voss, I don't take it at all that it's the Government's position that Operation Metro Surge has outpaced the Government's ability to lawfully process detentions and comply with judicial oversight.  That's not the Government's position, is it?

MS. VOSS:  No, certainly not, Your Honor.

THE COURT:  Right.  And does the DOJ feel that just because it has or needs resources to process all of the claims and comply with court orders, that that is a reason for the Court to be relaxing constitutional requirements?

MS. VOSS:  No.  Certainly not, Your Honor.

THE COURT:  So I do take compliance seriously; and, as the Government well knows -- you may be seated -- if you don't comply with the Court's orders, you've essentially painted the Court into a corner because what are we supposed to do?  We're here to determine what the law is, and we're here to sort out whether the detentions were lawful or not and to issue orders for release if we find the detentions were not lawful and to oversee that that gets executed.  And when that does not happen, then here we are.

And in our case, the Court has had hundreds of these at this point.  And the Court is busy too and made all the more busy if on a given day we ask, within 48 hours, to

be notified of the date, time, and location of the release of someone who's been ordered released, to receive nothing at the time that has been ordered, send a follow-up and receive nothing, send another follow-up order, and then receive a response that doesn't answer all three things. You might get one, you might get two.  Then you have to respond again.  And, in some instances, find that the person hasn't been released at all as had been represented.

And all this really means is that what should be a straightforward order, we have heard the arguments, we have found the detention to have not been lawful under the circumstances, person should be released, we find just repeatedly that that's not enough.  It takes repeat, after repeat, after follow-up, after follow-up with the Government, and we'll see some of those in just a moment when we go through the matters.

So I'm going to stop there just by way of background and follow up on the responses I received from Ms. Le and from Ms. Voss.  And if you want to come up to the podium, Ms. Le.

MS. LE:  Yes, Your Honor.

THE COURT:  I would like to walk through the five matters and get a better understanding of what the issue is and what we might expect going forward.  So if we could start with Segundo, 26-603.

MS. LE:  Your Honor, may I approach?  I would like to present some --

THE COURT:  You have approached already.

MS. LE:  Thank you.

(Documents handed to the Court)

MS. LE:  So that's the first case, Your Honor, that I have in front of me here.  And I tabbed it so it'd make it easy for you to kind of follow.

THE COURT:  I have the case materials in front of me here as well, so you can proceed.

MS. LE:  So I receive the -- okay.  Just to have some background, I was put on this special mission to help with the U.S. Attorney Office with all the habeas claims that they have received.  They are overwhelmed and they need help, so I, I have to say, stupidly enough to volunteer.

I started with the agency on January the 5th.  As of today, it's been more than four weeks.  I just got my PIV card to the DOJ system yesterday.

THE COURT:  Where were you working before?

MS. LE:  I was working for the Department of Homeland Security as an ICE attorney in the Immigration Court.

THE COURT:  Okay.

MS. LE:  So in January 5th when I started with the agency, I have to be honest, we have no guidance or

direction on what we need to do.  And so when you showed up, they just throw you in the well and then here we go.  I was tagalong with attorneys during my first week of my assignment there.

So this one here, the first case, was assigned to me actually on January 26th, which is about the third week of the -- the third or the fourth week into my job.  I received the assignment on the 26th of January at 11:14 a.m.  I file the response immediate at -- the same day at 4:08 p.m.

And during that time, the respondent [sic] already been transferred to Texas, and it was at around 2:37 p.m.  I mean, I apologize.  It was -- it was not transferred to Texas, but the respondent [sic] was transferred from Texas to the Whipple Building at around 2:37 p.m.

And then he was transferred from Whipple Building to Sherburne County Jail on that same date at around 5:00 p.m.  That's the timeline that I was able to see in the system.

I receive your order and I sent it out just a few minutes shy after he was sent back -- he was sent from the Whipple Building to the Sherburne County Jail.  I sent it to them at around 5:38.

And I did not receive the order.  With the -- how the agency's set up, usually our paralegal receive the

notification, and they send to me for review and processing. And with everything going on, I did not receive the order until it was too late.

The next order that showed up in my e-mail inbox, it was on 1-30. That's when you have an order for us to -- question about, Where about this party? Where about the petitioner?

THE COURT: Right.

MS. LE: I sent a follow-up --

THE COURT: If I may --

MS. LE: Yes.

THE COURT: -- this began with an order that granted the habeas release and ordered immediate release on January 27th from this Court. "Respondent shall immediately release Petitioner from custody. Within 48 hours ... shall file an update on the status of Petitioner's release." And that would have been on January 29th. There should have been a notice provided. There was no 48-hour update that was filed.

And then on the 30th, there was a text order from me ordering to file an update -- reminding that there was an order to file an update within 48 hours, and then saying, file a letter by no later than 5:00 p.m. on the 31st showing cause why there shouldn't be contempt held for violating the Court's order.

January 31st came, no letter was filed by 5:00 p.m. either.

And then on February 1st of 2026, petitioner's counsel, not the Government, petitioner's counsel filed a status report stating that the petitioner still had not been released, although immediate release was ordered on January 27, and he was here in Minnesota.

And then February 2nd, there was an order to show cause from this Court ordering respondents to immediately file an update regarding petitioner's release.

And then on February 3rd, a day later, there was still no immediate update, no written memorandum filed, and then we learn that the petitioner had been released on February 2nd at 10:00 p.m.  And which we learned from a representation that was made in a different case, not in the Segundo matter, we learned he'd been released on February 2nd at 10:00 p.m.  Still, no direct response to date, time, location of the release.  And so that's what led to the order to show cause.

And I hear, you know, the concerns that are raised by the DOJ with having to comply with the specificities that the Court is asking for, but look how much trouble it takes in response to a simple inquiry to file an update on the status of petitioner's release on January 27th.  The Court had to ferret out its own answer, in essence, days later, on

February 2nd.  What -- what can the Court expect going forward, because this is obviously not workable, and it's certainly not an example of complying with the Court's order, unless you feel it is?

MS. LE:  No, I don't feel like that it is at all, Your Honor, and I'm trying my very best to help to come up with a system or, you know, a procedure somehow so that we, the SAUSA people, taking on the detail can help moving it forward and smoothly and in complying with the Court.

And I'm not defending all the misbehave- -- mishap on the case, but what I can tell you too is, Judge, that most of the e-mail was sent to my DOJ e-mail.  And I did not received it until it was too late.  And I still am having trouble accessing my DOJ e-mail.  So everything -- if it was in my ICE e-mail, then, yes, I receive and I will respond. If it's sent to a DOJ one, I don't have a way to access the system.  But as for your -- how -- what are we -- moving forward what are we going to do, Your Honor, may I approach?

THE COURT:  Yes, you may.

MS. LE:  Thank you.

Here we go.  Thank you.

(Documents handed to the Court)

MS. LE:  Your Honor, those are a couple of e-mails that were sent to me from the petitioners' counsels of how hard I try to be in compliance, to fix the system, and to

get the person released. And if you will flip to the last page, during my first week, I don't want to say the number, but that's how many hours I put into this work because I did not know what I was expected to do.

On the second week, the number increase almost double, Your Honor.

THE COURT: So are you telling the Court that you were brought in brand new, a shiny, brand new penny into this role, and you received no proper orientation or training on what you were supposed to do?

MS. LE: I have to say yes to that question, Your Honor.

THE COURT: Right. All right. You can proceed.

MS. LE: Okay. And so I slowly figured out what is it that needed and what the requirement that we need to do for the full lifetime of a habeas, from the start of the petitions when we received it, until the end.

And since that point, on this last week, that's when it's like, Okay, this is the process. So I do now have a process in place of going forward what we need to do so that we can comply with the Court, and as the Court can see, those e-mails are evidence that it's working.

THE COURT: So is then each attorney within your office making up his or her own process?

MS. LE: I don't know about that, Your Honor, but

as the SAUSAs attorney, there are four of us, and we are trying to figure out what do we need to do to handle this operation.

THE COURT:  All right.  Let's proceed to the next case if we could --

MS. LE:  Yes.

THE COURT:  -- and I would like to next --

MS. LE:  As to the next case, may I approach, Your Honor?

THE COURT:  Yes.  I'd like to hear about the Oscar case.  Oscar 26-167.

MS. LE:  Yes.

(Documents handed to the Court)

THE COURT:  You know, I suppose by way of protocol, it would be proper to have shown what I'm receiving to the petitioners' counsel.  So if you would, hand that to them.  Did you have a copy for the --

MS. LE:  I don't because I have not redact all the information, but these are the e-mail and the correspondences that I worked on the case, and it show that we not lacking of not following up or not doing our job.

THE COURT:  Well, if you have unredacted sets of information, I'll tell you what, I'm going to return it to you.

MS. LE:  Okay.

THE COURT:  And I have my own materials and facts on the case here anyway.  I'll just give it back.

MS. LE:  Thank you, Your Honor.

Okay.  So for that, again, it was during the assignment in the second week of -- on the job.  Again, at this time I have not sworn as a U.S. Attorney to present or have cases in front of Your Honor, so all -- everything goes to the chief.  I get nothing, no notification, nothing at all, except for whatever that was sent to me to work on.

I received the assignment on the 12th, and I sent a follow-up e-mail to the Office of Principal Legal Advisor for documentation and for declaration -- for the deportations officer declaration.  And on the 14, I file my response with the Court.  I receive the court order through all the e-mail exchanges within the office, because the paralegal will receive it, download it, and they will send it to me.

On the 17th, three days after I file my response, I receive your order, Your Honor, at around 10:00-ish, 10:12 a.m.

THE COURT:  So let me stop you there --

MS. LE:  Yes.

THE COURT:  -- because that January 17th date is in my timeline also.  This petitioner that I refer to as Oscar here was, again, a petitioner who had no criminal

history that warranted mandatory custody, and he was apprehended by ICE on January 10th of 2026.

On January 15th, there was an order from this Court that he had been ordered released and respondent shall confirm the date, time, and location of petitioner's release within 48 hours from the date of this order on the 15th.

January 17th, which was the date you were referring to, is when you first --

MS. LE:  Received the order.

THE COURT:  -- received the order because it didn't get to you within your office.

MS. LE:  Yes.

THE COURT:  There was no 48-hour update that was filed on the 17th.

And then on the 19th, two days after that, the Court writes again, "Respondents were ordered to immediately release Petitioner from custody in Minnesota and to confirm the time, date, and location of release within 48 hours." That hadn't happened.

And so then the Court is saying that -- that I wanted a letter no later than 3:00 p.m. on the 19th showing cause why you shouldn't be held in contempt for violating the Court's order.

Then on the 19th, I'm told the petitioner was scheduled for return to Minnesota on a flight from El Paso

on Tuesday, January 20th, '26, and that he would be released upon his return.  That was on the 19th of January.

On the 20th, I write, because we'd received no notice that the release had taken place, "Respondents state that Petitioner is scheduled for return and release in Minnesota on January 20th."  Respondents must file an update by the end of the day on the 21st, is what I'd asked for, "stating the status of the Petitioner's release."

Then we learn that on the 20th when the release was supposed to have taken place, there was no release.  Instead, we're told that counsel for ICE had represented to petitioner's counsel that the petitioner was currently on his route stop in Albuquerque, New Mexico, not El Paso, Texas, and is scheduled to arrive in St. Paul on Saturday, the 24th.  And this is already then nine days after this person has been ordered released and found to have been unlawfully detained in the first place.  So nine days later, he's still in custody, now being flown around from El Paso to Albuquerque, New Mexico.  So the petitioner's counsel then files a motion for contempt because of the facts as I just stated them.

On the 21st, I ordered then Ms. Voss to file a written response.  I'm sure she's had more than one day where she regrets how well I know her name since most things end in, you know, Get ahold of Ms. Voss.  But I ordered

respondents' counsel, Ms. Voss, to file a written response by 4:00 p.m. on January 22nd providing the factual basis for why I was told in the first place that the petitioner was scheduled to return to Minnesota on the 20th on a flight from El Paso when he, in fact, remained in ICE custody in Albuquerque, New Mexico.

Ms. Voss responded on the 22nd, explaining the timing of when she learned the facts. And let me pause there to make another point kind of clear enough.

I wholeheartedly embrace the notion of a unitary executive, as in DHS, ICE, the DOJ, all a part of the Executive Branch. And if there's a problem in the restaurant, I don't intend to go in the kitchen to try to figure out who makes the bread. And all of it is part of the Executive Branch. And so it is not an excuse to tell me you contacted ICE because ICE is also part of the unitary executive for accountability purposes.

But in any event, on January 24th, there was no confirmation of release filed stating that he had been released on the 24th either, nine days later. And, in fact, he wasn't even returned on the 24th.

So then on January 26th, we're still at it. And, again, I'm here referring to an order for release that was on January 15th, state the date, time, and location, and this is the follow-up I'm still having to do because I still

don't know.

So then I hear from the Government and order the Government that the Government -- on the 26th -- must file an update by 4:00 p.m. on the 27th of January confirming the date, time, and location of petitioner's release.

On the 27th, I hear from you, Ms. Le, and "I want to inform the Court I've received confirmation regarding the petitioner's itinerary and confirmed that petitioner will be transported back to Minnesota via a commercial flight today." However, due to safety concerns, you asked for an extension of time to provide an update on his release today prior to midnight. And at which point I granted the extension of time and asked that an update confirming the date, time, and location of the release be provided no later than 10:00 a.m. the next day, on the 28th. 15th ordered release, now we're to January 28th, 13 days later, for someone who was not lawfully detained in the first place.

So then on the 28th, Ms. Voss requested a brief extension because they had not received the prior order until later in the day, which was an issue I think with the notice from my clerk's office with providing that notice. And so then the update -- we wanted the updated response from the Government by 8:00 p.m. on January 28th.

On January 28th, I do hear from you, Ms. Le, at 9:17 p.m., stating that petitioner was released on the 28th

at 4:30 p.m. in Minnesota.

I'd also asked for information about what the safety concerns were, and you don't have to say what those were. It's enough to say that I asked about the safety concerns then, I followed up in two other follow-ups from the Court asking what were these safety concerns that explain this delay. And to this day, I've never gotten an answer despite the follow-ups with the Court. And I've put that issue under seal, so it need not necessarily be discussed in open court, but I've gotten no responses at all for what the safety concern was. And, Ms. Le, am I right that for -- just --

MS. LE: You are correct on the dates and the time. And, yes, on the 27, when he was supposed to be landed in Minnesota -- St. Paul, Minnesota, at 9:31, I waited for a few minutes to make sure the plane landed, and then I check. The airline, they say the plane was landed safely and actually a few minutes early. So I reach out and check again to see where's the respondent so that we can get him -- not respondent -- but the petitioner so that we can get him released, and found out that he did not make it on the flight because the airline declined to let them on board. So I escalate it to the higher-up, and I also put it in my 24 font, this needs to be done. And I asked for another commercial airline, and that's how he was on board

the next day to landed here, Your Honor.

THE COURT:  But my question is --

MS. LE:  And I wanted to answer --

THE COURT:  Ms. Le, please.

MS. LE:  Yes.

THE COURT:  Ms. Le, you're not to talk over the Court.  If I am asking in writing and then having to pick it up multiple times thereafter to follow up with follow-up questions because I've never gotten an answer, why did you -- have you not, to this day, provided a written response as requested by the Court as to what the safety concerns were?  Why did you not respond?

MS. LE:  I draft a letter on the 28th at -- a long letter and send it on to my superior so that they can -- I mean, actually send it on to my paralegal so that they can file it with the Court with all the flight information and everything else in that.  But Ms. Voss already told me that she took care of updating the Court, therefore, that letter was never sent.

THE COURT:  All right.  So that letter would have explained to me what the safety concern was?

MS. LE:  The letter was including the flight information for each and every single departure --

THE COURT:  Ms. Le.

MS. LE:  -- Your Honor, not --

THE COURT: Ms. Le, please, Ms. Le, please answer my question. Did the letter explain to me what the safety concern was since that was my question?

MS. LE: No. I --

THE COURT: That's enough. That's enough.

MS. LE: Thank you.

THE COURT: Then you can go back to my other question, which was, why, if somebody is ordered released on January 15th, and they're not released for 13 days, January 28th, based upon a purported safety concern, when the Court asks what was the concern, why, after multiple requests, have you not responded to explain what the safety concern is since a person unlawfully detained was kept in detention, behind bars, for 13 additional days and no explanation had been given? Why not a response?

MS. LE: The reason that I -- I did ask. And I was told if we provided all information, the protester will show up at the airport and the agent and other people will be in dangers. So I took it to heart, because during that time, it was very heated here in Minnesota with all the protests that was going on. Any public thing that was going on is at risk. Even myself is also at risk for putting my name and myself in here, Your Honor. That's the safety concern that I have.

THE COURT: So my question had to do with the

safety concern for why the person could not be put on the airplane in presumably Texas or New Mexico or wherever he was at the time.  And is your answer because they were concerned that if he were put on a plane, that if he arrived here, there may have been a public reaction of some kind?

MS. LE:  Your Honor, he was escorted with other agents.  He wasn't put on the plane by himself.  The original plan was to have agent escorted him back, and with the protests was going on during that time, I was advised to be careful of what information to put out in public so that for the safety of others.

THE COURT:  So I'm not altogether following since I was told that the safety concern was one the airline had raised --

MS. LE:  As for -- as for the airlines, I don't know why they denied his boarding and the agent boarding.  I don't know that, but I know that they were denied.  I have the tickets and I was going to present it to you with the tickets that it was bought for him and the agent.  But they both were denied by the airline.

THE COURT:  And when the various persons are detained and then flown to El Paso or New Mexico, are they flown out of here on commercial airlines then?

MS. LE:  That's -- I don't know, Your Honor.  I don't know how to answer that questions.

THE COURT:  Do you know that they are flown out of Minnesota sometimes within hours, if not the next day, of being detained?

MS. LE:  Yes.  I know that they are doing that.

THE COURT:  And do you feel there's anything wrong with taking hours or days to fly them out of Minnesota when they've been --

MS. LE:  Oh, yeah, definitely.

THE COURT:  Just a minute.  Let me finish my question.

MS. LE:  Yes.

THE COURT:  -- to fly them out of Minnesota and then take 13 days to return them when they've been found to have been unlawfully detained?

MS. LE:  Your Honor, I did ask the same question too.  I have not got the answer.

THE COURT:  All right.  Let's talk about the next one, which is Jose, and that is Number 26-244.  And in this particular matter, for the petitioner known as Jose, again, there was nothing in the record that reflected that he had had a criminal history that warranted mandatory custody and he had also been then released -- ordered for release on January 15th, 2026.  And there had been an order that there be an update filed with the Court within 48 hours just confirming date, time, location of release.  That he was not

released at the 48-hour update.

I received a notice on January 19th from -- a letter filed by Ms. Voss, and this is after -- by the 19th, I had already put into place a show cause order since there had not been compliance with the Court's order to verify date, time, location of release. Then on the 19th, I hear from Ms. Voss that petitioner was released from detention on January 18th, 2026.

Now, the problem there, and I won't walk through all of the additional times I had to communicate with the Government with respect to closing out the unconditional release ordered of Jose, but suffice it to say, the dates included January 22nd, January 30th, several of them on January 30th, because what I learned was that in the case of Jose, who had been ordered to have been released without any conditions, I learned that the Government had imposed conditions on his release that were not a part of the Court's order and that were not imposed based upon any consent agreement, order from the Court. Is that accurate?

MS. LE: That is accurate, Your Honor.

THE COURT: And then your office has to then engage in more efforts because those conditions have to be then struck because they weren't ordered by the Court. Is that what you had to do then?

MS. LE: I have to go back and pulling teeth to

get things fixed.  And it took a long time.  For a long time the ICE agency is work under the Immigration Court, and they have their own policy and procedures.  To get my back-home colleagues up to date that Federal Court is not the same as how Immigration Court operate, it took a long, long, long time and many order to show cause to explain and let them know that, Come on, if you guys don't fix it, I'm going to quit and you are going to be dragging yourself into court.  I have to say that too in front of that in order to get it fixed.

I did put in my resignation from the job too, but they couldn't find a replacement.  So I gave them a specific time and -- to get it done.  If they don't, then by all mean, I'm going to walk out.  And before I walk out, I was able to release another individual, a juvenile.  That kind of like a step -- like a barrier.  Like, Wait, Julie, stop.  You need to go back and get more people out.  That's why I'm still here.  I am here just trying to make sure that the agency understand how important it is to comply with all the court orders, which they have not done in the past or currently.

I am here as a bridge and a liaison between the one that in jail, because if I walk out -- sometime I wish you would just hold me in contempt, Your Honor, so that I can have a full 24 hours of sleep.  I work days and night

just because people still in there.

And, yes, procedure in place right now sucks. I'm trying to fix it. As you can see the e-mail that I sent to you, it has been improving, a great improvement.

And last night I had to stay up until 2:35 a.m. just to get this documents ready for you. It's a -- I can't say it's a waste of my time, but I could have sent so many more e-mail and get so many more people get ready to be released. And I am here with you, Your Honor. What do you want me to do? The system sucks. This job sucks. And I am trying every breath that I have so that I can get you what you need.

THE COURT: All right. So I hear your frustrations and comments about the job. My question is: Are you expressing those to the others who are --

MS. LE: I do.

THE COURT: -- just a minute -- the others within the DOJ or ICE or DHS who have the role of carrying out the Court's orders that require immediate release? How is this frustration getting translated?

MS. LE: I write an e-mail with big, bold font. I CC Ms. Voss in it, and I said, here's what it fail and we need to fix it. You can't just have people sitting in jail and drag me into court and explain to the Court why the system fail. And if they can't help me, then I am not

here -- I'm not meant for this job.  And to be honest, Your Honor, I did put for a request to be transferred back, but no one were willing to come here to stand in front of you to explain and/or to help to improve the system.

THE COURT:  Do you, Ms. Le -- because with this particular case, where it ended up is with the Court having ruled that the petitioner had been unlawfully detained, and the remedy for the unlawful detention was that that person should be immediately released because they should not have been arrested and detained in the first place.

Are you in any way defending the idea that for somebody who's been ordered to have been released unconditionally because they were unlawfully arrested, that the Government or DHS or anyone should be imposing conditions upon their release that the Court hasn't approved of?

MS. LE:  I am not defending it.  That's why I have to go back and get them corrected, and it is corrected.  But it took a fight, a big, huge fight to get that done and to move forward with the next case and the next case.

Every day, every hours that we have tons of e-mail, and I pick up calls from any people that call to help with their cases regardless.  So it is improving.  It wasn't like that before, but because of my positions as an ICE attorney in the past and a SAUSA in the present, it took

me a few weeks for them to understand that this -- these are important conditions that we have to follow.  These are important things that we have to do.  If not, I'm going to put their names on the briefs and then you can bring them into court.  That's not just you threaten me, Your Honor, I always -- I also go back and threaten them.

THE COURT:  I want you to understand my goal in any of this is not to threaten you or anyone.  What we really want is simply compliance, because on the other side of this is somebody who should not have been arrested in some instances in the first place who is being haled in jail or put in shackles for days, if not a week-plus, after they've been ordered released.  That's my concern is for upholding the rule of law and the constitutional rights of all concerned.  And so that's my concern.  I'm interested in compliance and not so much in threats, and I'm just trying to figure out how to get it.

And I know that the Government has a concern about the growing number of requirements that the Court puts in place upon release of individuals.  That happens because of the things we learn.  For example, if we say, release the person immediately, then we learn that, having transported him to El Paso or New Mexico, you don't bring him back.  We learn that somebody is put out on the street with just the clothes on their backs and have to figure out how to get

back here when they should not have been arrested here in the first place, let alone flown halfway across the continent of North America. And have to -- so now we have to address that. We have to now say, Bring them back.

And then we say, All right, so you brought them back. We can't have them released when it's minus 14 outside. And so now we have to address that. Don't release them in the circumstances that might endanger their health or safety.

And so once that's addressed, then we learn they've been released, but now conditions have been imposed. That somebody who should not have been arrested in the first place is now being told, You're going to be released if you wear an ankle monitor, which the Court didn't order because the person was unlawfully detained in the first place. Then we have to go back and address that now.

And I hear the concerns about all the energy that this is causing the DOJ to expend, but, with respect, some of it is of your own making by not complying with orders. Do you understand that?

MS. LE: I do. And I share the same concern with you, Your Honor. I am not white, as you can see. And my family's at risk as any other people that might get picked up too, so I share the same concern, and I took that concern to heart. But, again, fixing a system, a broken system, I

don't have a magic button to do it.  I don't have the power or the voice to do it.  I only can do it within the ability and the capacity that I have.

And every cases I touch, I give it 100 percent. Never in my mind that one petitioner is more than the others.  They all important to me.  So -- but there are certain things that I -- it takes ten e-mails to get a release condition to be corrected.  It take two escalation and a threat that I will walk out for that to be corrected.

I took it to heart, and the agency is slowly seeing what the Court are doing.  And it takes time for them to learn the lesson too and abide and comply with the Court. I and Ms. Voss here working days and night.  Our e-mail just never stops.

And as you can see, I -- I would -- I would love to undo all of this stuff because no one want to be in jail. And actually, honestly, you know, being in jail a day to get -- catch up with sleep is not bad right now with all the hours I have to put in into this job.

THE COURT:  Ms. Le, I appreciate your candor. There were two other cases here.  I don't need to discuss them unless you want to take issue with the violations that the Court found with respect to those two matters.

MS. LE:  No, Your Honor.  But with respect to those, I figured out what the fail was.  When I -- I didn't

know that I have to do all the status follow-up when it's only, like, a small paragraph. That's to be honest. I thought it was, you know, someone else's job.

And then I figured out everybody is busy, so the one thing that I have asked my colleagues and I to do is when you send out for a release, now click a few more button on the e-mail, do a follow-up, and then a reminders. And that way the e-mail will go on top of -- you know, at that date at that time, and then we can fix that issues going forward. That's what I can tell you.

THE COURT: All right. Ms. Le, thank you.

MS. LE: You're welcome.

THE COURT: You can retake your seat. I have some questions for Ms. Voss.

MS. LE: Your Honor, may I have that documents that I gave you earlier back, because it's not redacted?

THE COURT: I think I gave them all back.

MS. VOSS: I think we have them.

MS. LE: All of them back? Okay. Thank you.

THE COURT: Okay. Thank you, Ms. Le.

MS. LE: Thank you.

THE COURT: All right, Ms. Voss. Here we are again. When this Court issues a release order, who is the person or -- person or office responsible for being sure that it's carried out?

MS. VOSS:  Your Honor, I take very much to heart your comments earlier.  You're right, it is the Executive Branch, the entirety of it.  DOJ has a role in that, DHS has a role in that, and it's both.

THE COURT:  Well, so, within ICE, for example, is there a specific officer or unit, chain of command, that's accountable for execution of judicial release orders?

MS. VOSS:  Your Honor, obviously the agency is broken up into components, you're right, and some are counsel components and some are operational components.  And I don't think either one of those is solely responsible.  Both -- again, both would have a role, but there is an operational person at the end of the line.

THE COURT:  All right.  So with whom does the buck stop?

MS. VOSS:  Your Honor, I think it stops with leadership.  Certainly, in my division, it stops with me and the U.S. Attorney.  And the U.S. Attorney is answering to --

THE COURT:  So I have gotten, for example, quite a few responses for why a person has not been released as ordered.  And I get responses back from the DOJ advising me as to when you all reached out to ICE and either haven't gotten a response back yet or this is all we got back by way of a response.  And which then makes this some opaque sort of shield that I can't really see behind to figure out why

the orders aren't being complied with. And the answer cannot be that we called ICE and then a shoulder shrug.

MS. VOSS: Yes, I understand that. Certainly, Your Honor. I think the respondents in each of these are the agency heads. You've got, you know, obviously General Bondi, Secretary Noem --

THE COURT: I get -- and not to rudely interrupt you, Ms. Voss, at least I don't mean to be rude about it, but what I'm trying to understand is what happens here locally. If there's an order for release, I'm assuming the order for release doesn't go to Ms. Bondi. Well, make it plain for me.

MS. VOSS: Your Honor, it goes to the St. Paul field office, which is housed at Fort Snelling.

THE COURT: It doesn't just go to a building, does it?

MS. VOSS: No, no, no, of course not, Your Honor. It goes to the agency counsel within that building, agency counsel that are responsible for this area, and it goes to the operational.

THE COURT: Should I have a hearing and have that agency counsel come down here to answer these questions? Because I do want to know why the orders aren't complied with and why. We take no great pleasure, as a Court, in compiling a list of some 90 or so cases of violations of

court orders for release, let alone the ten or so that I had just last week.  And I want to figure out how to get to the bottom of where the issue is.  Who is it, for example, that's determining that they're going to add conditions on a Court's order for unconditional release?  Who is doing that?

MS. VOSS:  Your Honor, I don't believe there is a policy to do that, so I don't know that that's being made purposefully at a higher level.  I believe that's being done operationally by the people who are carrying out the function; and that, if anything, it represents a lack of training and communication from the supervisors down.

THE COURT:  Well, who's responsible for their training and education?

MS. VOSS:  Each field office director, Your Honor. I think -- I'm not sure in these particular cases.  Usually in the cases, the field office director is named as a respondent.  Mr. Easterwood, Ms. Rich is sometimes named as a respondent.

THE COURT:  Before this operation started, Metro Surge, did the DOJ or DHS anticipate that it would generate a large volume of habeas petitions and court-ordered releases?

MS. VOSS:  Your Honor, I don't know the answer to that question.

THE COURT:  Do you know whether or not there were

any additional personnel, systems, protocols, that were put into place to ensure compliance with court orders that would arise from that operation?

MS. VOSS:  I don't know the answer to that either.

THE COURT:  And some of these may be questions better put to Mr. Rosen.  I understand that.  But at this -- at this hearing, I'm just trying to get to the bottom of how the Court cannot have to spend so much time in just getting its orders complied with.  And you have to concede, even before Operation Metro Surge, Ms. Voss, you've appeared before this Court many times, and I'm sure never in your career have you had such an incidence of having to account to the Court for noncompliance from the DOJ.  When have you ever seen anything like it?

MS. VOSS:  I have not in my career, Your Honor.

THE COURT:  Right.  So is it -- well, I'll stop there.  You can retake your seat, Ms. Voss.  Thank you.

For the petitioners, anything you wish to say or add at this proceeding?

MS. KELLEY:  May I approach, Your Honor?

THE COURT:  You may.  Can you identify yourself again for the record?

MS. KELLEY:  Thank you, Your Honor.  My name is Kira Kelley.  I represent Petitioners Oscar and Juan in these cases.

First, I'd just like to revisit your question earlier of whether the unitary executive's behavior in Operation Metro Surge has outpaced the system's capacity to ensure that the Constitution is being complied with.  And this is abundantly clear that the answer is yes.  We see from this hearing today and from the abundant cases before this Court and the other judges in this district that attorneys are -- they're not being credentialed or properly trained or supervised, nor are officers or agents of respondents from supervisors on down, Mr. Easterwood on down.  There are problems with supervision and training that have resulted in immense violence to our communities.  That we hear that it is pulling teeth for counsel of record to get her own client to fix these constitutional violations.  It should not be pulling teeth to get compliance from the Government with the Constitution.

And a question I have for the Court is:  Is the party making it impossible for counsel to comply?  Are they acting in blatant disregard of court orders so much so that their counsel sees her own self as a bridge between the Court and the party here?  That this is not -- this is unprecedented, and we know that counsel for respondents don't have the power to get their clients under control.  An e-mail with bold font is not going to change the widespread, systemic pattern of disregard for court orders and honestly

for basic human rights in this situation.

Detain first, find authority later, this is exactly their strategy, and we've seen this from all of our cases where there's no warrant, there's no probable cause. Most of my clients, they report that respondents, upon detaining them, have no idea who they are. They are pulled over for how they look or for where they are or for any number of things that don't amount to probable cause under the U.S. Constitution.

And I would point Your Honor to two declarations in a recent filing, which if Your Honor would permit, I could file in a supplement in this case. The first is a petitioner -- is a affidavit written by my client Oscar. And that was filed at Docket 67, The Advocates for Human Rights, et al., v. The U.S. Department of Homeland Security, et al., Case Number 26-cv-749.

And Oscar's declaration is important for a few reasons. One, it articulates just his horrific experience throughout this proceeding. And it's easy for us to see court orders not being complied with and the e-mails back and forth on the computer, but his affidavit really just shows what it's like to experience that and in ways that were personally for me just sickening to read as his attorney.

That he was without food. He was without clean

clothes.  He was subject to physical danger, both through reckless driving of ICE agents transporting him from one location to another, watching people screaming in pain with medical neglect, being exposed to COVID.  Just the conditions of his confinement; eating food that he conflated with dog food.  That people are just being treated like less than human.  And all of this was happening while he had a court order for his release.

And while all of this is happening, ICE agents are telling him to self-deport because he's got no chance to get out of there other than self-deport, so he's being deprived of access, and this is all in his affidavit.  Myself and his immigration attorney, who's here in the courtroom today, were not able to talk to him.  His immigration attorney in particular made diligent efforts to ensure compliance with the court order, and these are e-mails that are in Oscar's case.  I think you've seen these.  We're trying to get ahold of him.  We're trying to get access to him.  We're trying to bring him home.  And, meanwhile, he is sleeping on the floor, if he gets to sleep at all, and he's being lied to, denied access to phone calls to call his loved ones or his attorneys.  I would encourage Your Honor to read this declaration, and I would defer to the Court if you would like me to submit it formally in Oscar's own case.

And the second declaration also in The Advocates

for Human Rights proceeding, Docket Number 29, was an affidavit that I filed, and that details my own efforts to work collaboratively with counsel, with respondents' counsel, with -- I've been e-mailing and calling and trying to figure out how can we get these court orders complied with.

There's an e-mail in that Docket 29 that I sent eight days ago to ERO, to attorneys from the DOJ, the Assistant U.S. Attorneys and attorneys representing ICE, Jim Stolley; still haven't received a response. I'm begging for a means of clear communication, and I'm flexible. I'm sharing my personal cell phone. I'm saying, Whatever I can do to work with you all to get my clients home, let me know; to work with you all to get my clients' belongings returned, let me know, and I receive no response.

And I think just this question of the overwork of counsel here -- and I know we're all working above and beyond and not sleeping as much as we need to be, so I appreciate everybody for putting that effort in. And I invite the Court to think about the root cause of the problem, the root cause of our collective overwork here and the strain on our system with these repeated, repeated constitutional violations.

We shouldn't need a specific court order to ask the DOJ not to put somebody's life in danger. But I can't

tell you how many clients I've had to go find who were left on the side of the road with no coat, no phone, no wallet, no hat.  They're wearing Crocs or whatever they got pulled out of their house or their car while they were wearing, and it's zero degrees outside.  And we shouldn't need a court order saying, Don't put someone's life in danger.

But here we are, and we need court orders -- or orders to show cause to show compliance with court orders that shouldn't have had to have been issued in the first place.  I think this would be a different story if these habeas petitions were frivolous, but we're filing so many because there are just so many people being detained without any semblance of a lawful basis.

And there's no indication here that any new systems or bolded e-mails or any instructions to ICE are going to fix any of this.  Like we need -- we need judicial intervention, and it has to be -- it has to be more than just having -- having counsel be the go-between here, because we're -- I think we can see that counsel are being put in a position where they're working 20 hours a week -- 20 hours a day and it's not enough.

If our system cannot keep up with processing these petitions to have rights vindicated, then we need to see what here is outside of the control of these attorneys, where does the root of the problem lie.  And sanctions to

the party are within your inherent authority and are appropriate to bring this -- this situation, this egregious, widespread pattern -- you've referenced the 96 court order violations and counting just in part of January -- and we need this to be brought back into the Court's control and into the Constitution's control.  Thank you.

THE COURT:  Thank you.  Any comment from --

MS. VAYNERMAN:  No, Your Honor.

THE COURT:  Okay.  Thank you.

Anything further then from the Government?

MS. LE:  Not from me, Your Honor.

MS. VOSS:  Nothing, Your Honor.

THE COURT:  All right.  Court will take this all under advisement.  If nothing further, Court will stand adjourned.

(Court adjourned at 2:16 p.m.)

                    *     *     *


I, Erin D. Drost, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter to the best of my ability.


Certified by:  _s/ Erin D. Drost_

                    Erin D. Drost, RMR-CRR